UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| PIYUSH GUPTA,<br><br>    Plaintiff,<br><br>    v.<br><br>INTERNATIONAL BUSINESS MACHINES CORPORATION (IBM),<br><br>    Defendant. | Case No.  5:14-cv-01358-EJD<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION**<br><br>Re: Dkt. No. 31 |

    Plaintiff Piyush Gupta ("Plaintiff") filed the instant employment action against Defendant International Business Machines Corporation ("IBM"), alleging wrongful termination and disability discrimination.  Presently before the court is IBM's Motion for Summary Judgment or, in the Alternative, Summary Adjudication.  See Dkt. No. 31.

    Federal jurisdiction arises pursuant to 28 U.S.C. §§ 1332 and 1441(a).  After carefully reviewing the parties' pleadings in conjunction with oral argument, IBM's motion will be granted in part and denied in part for the reasons explained below.

**I.  FACTUAL AND PROCEDURAL BACKGROUND**

    Plaintiff began to work with IBM in May 2009, when IBM acquired Plaintiff's startup company.  Dep. of Piyush Gupta ("Pl. Dep."), Dkt. No. 36, Ex. P at 28, 31.  This was Plaintiff's second tour with IBM, as he had previously worked for the company from 1984 to 1995.  Id. at 19.  This case concerns events that occurred in 2013 leading to Plaintiff's separation from IBM.

1

Case No.: 5:14-cv-01358-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

In 2013, Plaintiff worked at IBM as Vice President, Product Management. Decl. of Inhi Cho Suh ("Suh Decl."), Dkt. No. 34 at ¶ 3. Partly as a result of frequent and extended business trips, Plaintiff developed back problems and began to experience back pain in 2011. Decl. of Piyush Gupta ("Pl. Decl."), Dkt. No. 41 at ¶ 17. Since February 2011, IBM knew of Plaintiff's back problems, and throughout 2012 and 2013, Plaintiff continued to travel extensively. Id.

At IBM, Plaintiff reported directly to Inhi Cho Suh ("Ms. Suh"), who at that time served as Vice President, Product Management & Strategy. Suh Decl. at ¶ 2. In turn, Ms. Suh reported to Bob Picciano ("Mr. Picciano") who served as Senior Vice President of Information Management. Id. at ¶ 5.

On January 27, 2013, Plaintiff emailed Mr. Picciano expressing discontent with his current role at IBM, and wishing to discuss a potential exit strategy to something else within IBM, or from IBM. Pl. Dep. at 56, Def.'s Ex. 1. Plaintiff also raised this issue with Ms. Suh, and explained that he would be interested in a role within IBM where he could spend time with clients and sales teams in India and serve as a trusted advisor to big clients in India. Pl. Dep. at 68-69, 71. On March 13th, Ms. Suh emailed Ms. Picciano referencing a discussion she had with Plaintiff about moving Plaintiff from a product management role to a different role that included monthly travels to India. Pl. Decl., Ex. F; Suh Decl., Ex. C. Mr. Picciano seemingly approved this proposition.

Also in March 2013, Plaintiff visited his physician to tend to his back problems. Pl. Dep. at 108. His physician advised that Plaintiff fly on business class when making business trips, and prescribed a sit/stand desk. Id.; Pl. Decl. at ¶ 19. Consequently, Plaintiff requested two accommodations from IBM: (1) the ability to fly business class on cross-country and international flights; and (2) ergonomic furniture for his home office, which would include a sit/stand desk and an ergonomic chair. Pl. Dep. at 109; Suh Decl. at ¶¶ 9-10. IBM approved Plaintiff's request to fly business class on flights longer than six hours, covering only international flights. Pl. Dep. at 109.

As to the ergonomic furniture, Plaintiff submitted this request to IBM on March 14th. Pl. Decl. at ¶ 21. At around this time, Plaintiff's physical therapist discussed the benefits of short-

2

Case No.: 5:14-cv-01358-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICIATION.

1  term disability leave, but Plaintiff was not interested in pursuing that option at the time because he
2  did not want to take the extended time off. Id. at ¶ 41. Thereafter, on March 23rd, Plaintiff
3  formally assumed his new role in India South Asia business development. Pl. Decl. at ¶ 15.

4  While Plaintiff was on a business trip abroad, Ms. Suh communicated with Plaintiff to
5  discuss a reduction in force, or "resource action," IBM would be undertaking. Pl. Dep. at 76; Suh
6  Decl. at ¶ 12. Ms. Suh told Plaintiff that she needed to lay people off from product management,
7  which was Plaintiff's former group, and she needed his suggestions on who should be laid off
8  given that he knew the members of that group very well. Id. After proposing ideas to reduce the
9  number of layoffs, Plaintiff told Ms. Suh that if she had to lay off so many people, then she should
10 probably put him on that list. Pl. Dep. at 77; Suh Decl. at ¶ 12. He also told her that given his pay
11 scale, Ms. Suh should be able to save two employees from layoffs. Id. Ms. Suh responded with
12 "that's not going to happen." Pl. Dep. at 78.

13 On May 29th, IBM's ergonomic expert completed an ergonomic evaluation and
14 recommended Plaintiff receive ergonomic furniture. Pl. Decl. at ¶ 22. On June 3rd, IBM Nurse
15 Mary Temo ("Nurse Temo") entered Plaintiff's ergonomic furniture request into the system, and
16 by early June, Ms. Suh was aware of this request. Id. at ¶¶ 22-23. On June 18-19th, while on a
17 business trip to India, Nurse Temo emailed Plaintiff inquiring about his back and advised that
18 Plaintiff discuss short-term disability with his physician. Id. at ¶ 24; Pl. Decl., Ex. K.

19 At around that time, in mid-June, IBM announced its resource action. Decl. of Edward
20 Matchak ("Matchak Decl.") at ¶ 4. The resource action was broad and resulted in layoffs across
21 much of IBM's software group in order to reduce costs. Id. Employees selected for layoffs were
22 offered certain severance benefits that included severance pay in exchange for executing a
23 separation agreement and release of claims. Id.

24 On June 19th, Ms. Suh communicated with Plaintiff and told him she was "going to take
25 him up on his suggestion" and select him for layoff. Pl. Decl. at ¶ 25; Pl. Dep. at 74-75, 78; Suh
26 Decl. at ¶ 14. Ms. Suh further stated that IBM was going to retire Plaintiff given his combined 15

3
Case No.: 5:14-cv-01358-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICIATION.

years of service, which would be more advantageous for him. Pl. Dep. at 78; Suh Decl. at ¶ 14.

On the same day, Plaintiff initiated an Instant Messenger conversation with Edward Matchak ("Mr. Matchak"), who served as IBM's Human Resources Partner. Pl. Decl. at ¶ 48; Matchak Decl. at ¶¶ 2, 8, Ex. M.  The conversation focused on the intersection between short-term disability and separation with IBM, and Plaintiff stated he was interested in going on short-term disability but not returning to IBM. Matchak Decl., Ex. M.

As to Plaintiff's ergonomic furniture request, Mei Yee Sam ("Ms. Sam") from IBM was handling the request. Pl. Decl. at ¶ 26. On June 26th, Ms. Sam emailed Ms. Suh a third reminder to approve Plaintiff's request for ergonomic furniture. Id.; Suh Decl., Ex. E. Two days later, on June 28th, Plaintiff emailed Ms. Suh notifying her that the sit/stand desk had been moving through the IBM process, and it was ready to order. Pl. Decl., Ex. J. Plaintiff further stated that he needed to try the sit/stand desk even if he was retiring. Id. Ms. Suh approved Plaintiff's ergonomic furniture request on July 4th. Suh Decl., Ex. E. At around that time, Plaintiff began exploring the option of short-term disability. Plaintiff consulted his physician, and on July 2nd, he applied for short-term disability at IBM. Pl. Decl. at ¶ 38; Pl. Dep. at 92.

Concurrently, Plaintiff was planning a final business trip to India, which he considered to be a very important trip for IBM. Pl. Dep. at 90. Due to the importance of the trip, Plaintiff talked to Ms. Suh about extending his last day with IBM from July 31st to August 15th. Id. at 90, 92; Suh Decl. at ¶ 17. Ms. Suh agreed the trip was important, and on July 9th, she emailed Mr. Picciano and human resources to approve the extension of Plaintiff's last day. Pl. Decl. at ¶ 45, Ex. P; Pl. Dep. at 90-92, 96; Suh Decl. at ¶ 17. On July 11th, Mr. Picciano approved the extension. Pl. Decl., Ex. P. Although Plaintiff's last day would be August 15th, his employment was "bridged" for purposes of retirement benefits to August 31st. Pl. Dep. at 80, 223; Suh Decl. at ¶ 16; Matchak Decl. at ¶ 16.

On July 19th, Nurse Temo emailed Plaintiff notifying him that his short-term disability request had been approved for July 10th through August 18th, 2013. Pl. Decl. at ¶ 43, Ex. O; Pl.

Dep. at 91, 150-51. Upon realizing that the short-term disability leave would conflict with his business trip to India, Plaintiff spoke to Nurse Temo about delaying the leave. Pl. Dep. at 91; Pl. Decl., Ex. O. Nurse Temo informed Plaintiff that the only way to change the short-term disability arrangement was for Plaintiff's physician to approve the change. Id. Plaintiff then contacted his physician and requested a change on his short-term disability leave so that he could make the business trip to India. Pl. Dep. at 91-92, 96. On the same day, Plaintiff notified Nurse Temo that his physician would be sending a notification to disregard the short-term disability request. Pl. Decl., Ex. O. On July 24th, Nurse Temo emailed Ms. Suh to disregard Plaintiff's previous request for short-term disability. Pl. Dep. at 153; Suh Decl. at ¶ 18; Suh Decl., Ex. F.

On July 25th, Plaintiff had a second Instant Messenger conversation with Mr. Matchak inquiring about retirement, and then followed with a telephone conversation. Gupta Decl. at ¶ 53, Ex. L. The next day, Plaintiff received documents pertaining to his separation package, and two days later, he departed to India for his final business trip. Pl. Dep. at 81, 83, 176; Suh Decl., Ex. G. While Plaintiff was in India, on July 29th, an IBM employee emailed Plaintiff and Ms. Sam notifying them that the ergonomic furniture request had been cancelled because IBM does not order equipment for retiring employees, only active employees. Pl. Dep. at 129; Pl. Decl., Ex. M.

Plaintiff spent his last date of employment, August 15th, in India and extended his stay to take a personal vacation at the end. Pl. Dep. at 96-97; Suh Decl. at ¶ 19. Thus, when Plaintiff returned to the United States on August 18th, he was no longer an active employee. Pl. Dep. at 97; Suh Decl., Ex. G. On August 22nd, Mr. Matchak conducted Plaintiff's exit interview where they discussed the benefits Plaintiff was entitled to, and Plaintiff ultimately declined to sign his separation agreement. Pl. Dep. at 80-81, 83, 97; Matchak Decl. at ¶ 6.

On September 8th, Plaintiff emailed Ms. Suh requesting additional time to review the separation documents and consult with an attorney. Suh Decl., Ex. G. In response, Ms. Suh provided Plaintiff with a deadline of September 19th. Id.; Pl. Dep. at 141-42. Thereafter, Plaintiff retained an attorney and emailed Ms. Suh expressing concerns over certain terms of the separation

5

Case No.: 5:14-cv-01358-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICIATION.

1   package, after which Ms. Suh referred Plaintiff's counsel to speak to IBM's general counsel . Pl.
2   Decl., Ex. Q.

3   In February 2014, Plaintiff filed a complaint with the California Department of Fair
4   Employment and Housing and obtained a right-to-sue letter, thereby exhausting his administrative
5   remedies.  See Compl., Dkt. No. 1 at ¶¶ 7-8, Ex. A.  On February 24, 2014, Plaintiff commenced
6   the instant action in Santa Clara County Superior Court, and IBM subsequently removed the
7   action to this court claiming diversity jurisdiction.  See Notice of Removal, Dkt. No. 1.  In his
8   complaint, Plaintiff asserts five claims: (1) disability discrimination in violation of the Fair
9   Employment and Housing Act ("FEHA"); (2) disability discrimination in failure to engage in
10  timely, good faith interactive process; (3) failure to provide disability accommodation; (4) fraud in
11  the inducement; and (5) wrongful termination in violation of public policy.  See Compl.

12  In June 2015, IBM filed the instant Motion for Summary Judgment or, in the alternative,
13  Summary Adjudication.  See Mot., Dkt. No. 31.  Plaintiff filed an opposition brief, and IBM filed
14  a reply brief.  See Opp'n, Dkt. No. 42; Reply, Dkt. No. 44.  A hearing on this motion was held on
15  July 30, 2015.

16  **II.    LEGAL STANDARD**

17  A motion for summary judgment or partial summary judgment should be granted if "there
18  is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of
19  law."  Fed. R. Civ. P. 56(a); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).
20  The moving party bears the initial burden of informing the court of the basis for the motion and
21  identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, or
22  affidavits that demonstrate the absence of a triable issue of material fact.  Celotex Corp. v. Catrett,
23  477 U.S. 317, 323 (1986).

24  If the moving party does not satisfy its initial burden, the nonmoving party has no
25  obligation to produce anything and summary judgment must be denied.  Nissan Fire & Marine Ins.
26  Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1102-03 (9th Cir. 2000).  On the other hand, if the

6
Case No.: 5:14-cv-01358-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICIATION.

1   moving party does meet this initial burden, the burden then shifts to the nonmoving party to go

2   beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial."

3   Fed. R. Civ. P. 56(e); <u>Celotex</u>, 477 U.S. at 324.  The court must regard as true the opposing party's

4   evidence, if supported by affidavits or other evidentiary material.  <u>Celotex</u>, 477 U.S. at 324.

5   However, the mere suggestion that facts are in controversy, as well as conclusory or speculative

6   testimony in affidavits and moving papers, is not sufficient to defeat summary judgment.  See

7   <u>Thornhill Publ'g Co. v. GTE Corp.</u>, 594 F.2d 730, 738 (9th Cir. 1979).  Instead, the non-moving

8   party must come forward with admissible evidence to satisfy the burden.  Fed. R. Civ. P. 56(c);

9   <u>see also</u> <u>Hal Roach Studios, Inc. v. Feiner & Co., Inc.</u>, 896 F.2d 1542, 1550 (9th Cir. 1990).

10   Where the moving party will have the burden of proof on an issue at trial, it must

11   affirmatively demonstrate that no reasonable trier of fact could find other than for the moving

12   party.  <u>Soremekun v. Thrifty Payless, Inc.</u>, 509 F.3d 978, 984 (9th Cir. 2007).  However, where the

13   nonmoving party will have the burden of proof at trial on a particular issue, the moving party need

14   only point out "that there is an absence of evidence to support the nonmoving party's case."

15   <u>Celotex</u>, 477 U.S. at 325.  Provided there has been adequate time for discovery, summary

16   judgment should be entered against a party who fails to make a showing sufficient to establish the

17   existence of an element essential to that party's case, and on which that party will bear the burden

18   of proof at trial.  <u>Id</u>. at 322-23.  "[A] complete failure of proof concerning an essential element of

19   the nonmoving party's case necessarily renders all other facts immaterial."  <u>Id</u>. at 323.

20   **III.   DISCUSSION**

21   IBM moves for summary judgment on each of Plaintiff's five claims and prayer for

22   punitive damages.  Mot. at 1.  Each claim will be addressed in turn.

23   **A.   Claim #1: Disability Discrimination in Violation of the California Fair Employment and Housing Act**

24   As his first claim, Plaintiff alleges that his disability was a motivating factor in IBM's

25   termination of his employment.  Compl. at ¶ 24.  IBM moves for summary judgment contending

26   that Plaintiff's claim lacks merit.  Mot. at 9.

7

Case No.: 5:14-cv-01358-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICIATION.

"When entertaining motions for summary judgment in employment discrimination cases arising under state law, federal courts sitting in diversity must apply the McDonnell Douglas burden-shifting scheme as a federal procedural rule." Zeinali v. Raytheon Co., 636 F.3d 544, 552 (9th Cir. 2011). Under the McDonnell Douglas scheme, the employee "must first establish a prima facie case of discrimination." Id. If the employee does so, the burden shifts to the employer to "articulate a legitimate, nondiscriminatory reason for the challenged action." Id. If the employer meets this burden, the burden shifts back to the employee to "show that the reason is pretextual either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Id.

### i. Prima Facie Case of Discrimination

Under California law, "[a] prima facie case of disability discrimination under FEHA requires the employee to show he or she (1) suffered from a disability, (2) was otherwise qualified to do his or her job, and (3) was subjected to adverse employment action because of the disability." Nealy v. City of Santa Monica, 234 Cal. App. 4th 359, 378 (2015). Here, only the third prong is in dispute: whether Plaintiff was subjected to adverse employment action because of his disability. See Mot. at 9-10; Opp'n at 11.

Since it is Plaintiff's burden to establish a prima facie case of discrimination, Plaintiff's argument is considered first. Plaintiff, however, offers no argument discussing how his termination was due to his disability. An examination of the record shows that Plaintiff was able to work from home, his request to fly on business class was approved, his request to obtain ergonomic furniture for his home office was also approved even though it was cancelled because of his termination, his stay with IBM was extended in order to accommodate his final business trip to India, and his termination was considered a retirement recognizing his 15 years of service to the company. Further, Plaintiff testified at his deposition that nobody at IBM treated him unprofessionally or in a manner that was insensitive to his physical condition, and that he was

8

Case No.: 5:14-cv-01358-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICIATION.

1   unaware of any facts causing him to believe that his termination was due to his back problems.

2   See Pl. Dep. at 116, 188-89. The court agrees with IBM that Plaintiff cannot establish a prima

3   facie case of disability discrimination.

### ii. Legitimate, Nondiscriminatory Reason

Assuming Plaintiff could establish a prima facie case, the burden shifts to IBM to articulate a legitimate, nondiscriminatory reason for the termination. To do this, the employer must show that the procedure it used to terminate the employee was "validly and fairly devised and administered to serve a legitimate business purpose." Dep't of Fair Emp't & Hous. v. Lucent Techs., Inc., 642 F.3d 728, 745-46 (9th Cir. 2011). "To suffice under McDonnell Douglas, an employer's explanation must explain why the plaintiff 'in particular' was laid off." Diaz v. Eagle Produce Ltd. P'ship, 521 F.3d 1201, 1211 (9th Cir. 2008).

In this instance, IBM offers two arguments. IBM first contends that Plaintiff was laid off as part of a broad reduction in force consistent with its ongoing efforts to streamline operations, reduce costs, and improve productivity. Mot. at 10; see also Suh Decl. at ¶ 11; Matchak Decl. at ¶ 4. Generally, reductions in force have been recognized to constitute a legitimate, nondiscriminatory reason to terminate employment. See Villanueva v. City of Colton, 160 Cal. App. 4th 1188, 1194-95 (2008) ("[T]he law is settled that an employer's depressed economic condition can be good cause for discharging an employee.") (internal quotations omitted). However, courts have also cautioned against relying solely on a reduction-in-force rationale. "An employer's freedom to consolidate or reduce its work force, and to eliminate positions in the process, does not mean it may use the occasion as a convenient opportunity to get rid of its [protected] workers." Guz v. Bechtel Nat'l Inc., 24 Cal. 4th 317, 358 (2000); see also Diaz, 521 F.3d at 1211-12 ("Workforce reduction explains why [the employer] laid off a group of its workers, but it does not explain why [the plaintiff] was chosen to be part of that group."). Thus, the court considers IBM's reduction-in-force argument in conjunction with its second argument.

9

Case No.: 5:14-cv-01358-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICIATION.

IBM argues that Plaintiff was selected for layoff because he volunteered himself. Mot. at 10; see also Suh Decl. at ¶ 13. Plaintiff volunteering himself is well supported by the evidence on the record, including by his own admission. Plaintiff testified at his deposition that when IBM management was making decisions on who to select for layoffs, Ms. Suh communicated with Plaintiff to ask his opinion on which members of his former team should be selected. Pl. Dep. at 76. After Plaintiff offered Ms. Suh ideas on how to reduce the impact of the layoffs, Plaintiff told her: "if you have to lay off so many, you should probably put me on that list instead of taking these guys, and given my pay scale, you should be able to save two of them." Id. at 77. He further told her: "[f]rom your narrow perspective, I'm not doing product management. I'm doing sales, so you can happily put me on the list." Id. Plaintiff testified that a month or two later, in June 2013, Ms. Suh communicated with him and told him she would "take [him] up on that offer," and would select him for layoff. Id. at 78. This evidence, coupled with the reduction in force, is sufficient for IBM to meet its burden of establishing a legitimate, nondiscriminatory reason.

### iii. Pretext

Lastly, the burden shifts to the employee to "demonstrate either that the defendant's showing was in fact insufficient or that there was a triable issue of fact material to the defendant's showing." Lucent Techs., 642 F.3d at 746. The employee can meet this burden "by producing substantial responsive evidence that the employer's showing was untrue or pretextual." Id. "[T]he employee must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the non-discriminatory reasons." Id.

Plaintiff argues that IBM's purported legitimate, nondiscriminatory reasons are pretextual for three reasons. First, he contends that IBM's reduction-in-force rationale, by itself, is not sufficient to defeat Plaintiff's discrimination claims. Opp'n at 12. As noted above, the court agrees.

Second, Plaintiff argues that when he volunteered himself for the layoff, he was making a spontaneous remark. Opp'n at 11-12. In his declaration, he states that in the heat of the moment and in a reflexive effort to protect his colleagues, he volunteered himself but was relieved when Ms. Suh responded with "[n]ice try, that's not going to happen." Pl. Decl. at ¶ 3. Plaintiff considered his spontaneous remark to be in the past and off the table, and he believed that neither he nor Ms. Suh took it seriously. Id. This argument, however, is unpersuasive. It is undisputed that Plaintiff volunteered himself during a time when Ms. Suh was making decisions on layoffs, thus it is reasonable to believe that Ms. Suh relied on his statements in selecting Plaintiff for layoff. See Suh Decl. at ¶ 13 ("I [*sic*] also heavily influenced in reaching this decision by the fact that Mr. Gupta himself had suggested to me that he be selected for layoff."). That Plaintiff now regrets having made these statements is insufficient to overcome IBM's purported legitimate, nondiscriminatory reasons.

Third, Plaintiff argues that the proximity of time between the date Plaintiff's requests for accommodation became more insistent and the date IBM decided to lay him off is itself evidence of pretext. Opp'n at 13. Specifically, Plaintiff relies on the following timeline: on March 14th, Plaintiff submitted his ergonomic furniture request; by early April, the request was being processed; on May 29th, IBM's ergonomic expert completed an evaluation and recommended Plaintiff receive the ergonomic furniture; on June 3rd, Nurse Temo entered the request into the system; and on June 19th, Plaintiff was selected for layoff. Id. Despite the temporal proximity, this argument does not show pretext considering IBM knew of Plaintiff's back problems since 2011, IBM approved Plaintiff's requests to fly business class and short-term disability, and the undisputed facts show that Plaintiff volunteered himself for layoff. Thus, Plaintiff has not succeeded in establishing pretext.

In sum, there is an absence of evidence to support Plaintiff's claim that he was terminated because of his disability. Accordingly, IBM's motion as to this claim is granted.

**B.     Claim #2: Failure to Engage in Timely, Good Faith Interactive Process**

As his second claim, Plaintiff alleges that IBM failed to engage in a timely, good faith interactive process with Plaintiff to accommodate his known disability, and instead terminated Plaintiff because of his disability. Compl. at ¶ 29. IBM moves for summary judgment contending that Plaintiff lacks sufficient evidence to support this claim. Mot. at 13.

California Government Code § 12940(n) requires that an employer engage in a "timely, good faith, interactive process with the employee . . . to determine effective reasonable accommodations." The statute "requires an informal process with the employee to attempt to identify reasonable accommodations, not necessarily ritualized discussions." Nealy, 234 Cal. App. 4th at 379. The court's "ultimate obligation is to isolate the cause of the breakdown and then assign responsibility so that liability for failure to provide reasonable accommodations ensues only where the employer bears responsibility for the breakdown." Nadaf-Rahrov v. Neiman Marcus Grp., Inc., 166 Cal. App. 4th 952, 985 (2008).

Plaintiff disputes the manner in which IBM handled the ergonomic furniture request. Opp'n at 14. He argues that it took over 3½ months for his request to be reviewed and approved by Ms. Suh, and when Ms. Suh finally approved the request, the ergonomic furniture order was cancelled because Plaintiff had already been selected for layoff. Id. According to Plaintiff, this delay was an inconvenience given that his extensive travel continued to take a toll on his back. Id. at 14-15. In response, IBM argues that the short delay in processing Plaintiff's request reflects nothing more than routine processing of an accommodation request by a large corporation. Reply at 11.

It is undisputed that Plaintiff submitted his ergonomic furniture request on March 14th, IBM's ergonomic expert completed an evaluation on May 29th, and Nurse Temo entered the request into the system on June 3rd. It is also undisputed that after Plaintiff was notified of his layoff, on June 26th, Ms. Sam emailed Ms. Suh a third reminder to approve the ergonomic furniture request. See Suh Decl., Ex. E. Ms. Suh finally approved the request on July 4th. See id.

1   Based on the record, it appears that it took 3½ months—and three reminders—for Ms. Suh
2   to approve Plaintiff's request for ergonomic furniture request. In addition, Ms. Suh approved the
3   request while knowing that Plaintiff was already selected for layoff, and there is no indication that
4   Ms. Suh alerted Plaintiff that he would be ineligible to receive the ergonomic furniture due to the
5   layoff. As such, there is a triable issue of fact as to whether IBM participated in a timely, good
6   faith interactive process. See Swanson v. Morongo Unified Sch. Dist., 232 Cal. App. 4th 954, 971
7   (2014) ("Each party must participate in good faith, undertake reasonable efforts to communicate
8   its concerns, and make available to the other information which is available, or more accessible, to
9   one party.").

10   Accordingly, IBM's motion as to this claim is denied.

### C. Claim #3: Failure to Provide Disability Accommodation

12   As his third claim, Plaintiff alleges that IBM failed to provide him with a reasonable
13   accommodation. Compl. at ¶ 33. IBM moves for summary judgment contending that this claim
14   lacks merit. Mot. at 14.

15   Under California Government Code § 12940(m), an employer is required to provide
16   reasonable accommodations. "A reasonable accommodation is any modification or adjustment to
17   the workplace that enables the employee to perform the essential functions of the job held or
18   desired." Swanson, 232 Cal. App. 4th at 968-69 (internal quotations omitted). However, the
19   employer is not required "to make an accommodation that is demonstrated by the employer or
20   other covered entity to produce undue hardship to its operations." Id. at 969 (internal quotations
21   omitted). The elements of this claim are "(1) the plaintiff has a disability under the FEHA; (2) the
22   plaintiff is qualified to perform the essential functions of the position; and (3) the employer failed
23   to reasonably accommodate the plaintiff's disability." Id. Here, only the third element is in
24   dispute: whether IBM failed to reasonably accommodate Plaintiff's disability.

25   Plaintiff argues that IBM failed to meet its obligations to accommodate Plaintiff's
26   disability when it granted the ergonomic furniture request, but ultimately never delivered the

United States District Court
Northern District of California

furniture to Plaintiff. Opp'n at 16. In essence, Plaintiff appears to argue that IBM failed to provide a reasonable accommodation—the ergonomic furniture—because by the time the request was approved, his separation date with IBM was nearing, thus making him ineligible to obtain the ergonomic furniture. Consequently, Plaintiff never received the ergonomic furniture. As discussed above, it is undisputed that Ms. Suh approved Plaintiff's ergonomic furniture request 3½ months after he first submitted it to IBM, and IBM then cancelled the ergonomic furniture order in light of Plaintiff's separation with IBM.

"An employer cannot prevail on summary judgment on a claim of failure to reasonably accommodate unless it establishes through undisputed facts that reasonable accommodation was offered and refused . . . [or] that the employer did everything in its power to find a reasonable accommodation, but the informal interactive process broke down because the employee failed to engage in discussions in good faith." Lucent Techs., 642 F.3d at 743-44. While Plaintiff does not dispute the ergonomic furniture itself was appropriate as a reasonable accommodation, his argument that the 3½ month delay in approving the request could constitute a failure to provide reasonable accommodation is persuasive.

First, IBM has not been able to establish through undisputed facts that Plaintiff refused the ergonomic furniture. In fact, though he may not have been entitled to it by then, Plaintiff continued to inquire about the ergonomic furniture even after the date of separation. See Pl. Decl., Ex. M. Second, IBM has not been able to establish through undisputed facts that the informal process broke down because Plaintiff failed to engage in discussions in good faith. Instead, the evidence shows that Plaintiff continuously inquired about the ergonomic furniture, and Plaintiff emailed Ms. Suh to follow-up on a third reminder she received about approving the ergonomic furniture request. See Pl. Decl., Exs. I, J.

Furthermore, the court cannot determine whether the 3½ month delay in approving the ergonomic furniture request is "reasonable." The record does not provide information on how long IBM typically takes to approve such request, nor was IBM able to offer that information at

14
Case No.: 5:14-cv-01358-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICIATION.

1 oral argument. Given that this delay could have impeded Plaintiff's ability to obtain a reasonable
2 accommodation, there is a triable issue of material fact as to whether IBM fulfilled its duty to
3 provide a reasonable accommodation. See Prilliman v. United Air Lines, Inc., 53 Cal. App. 4th
4 935, 954 (1997) ("Ordinarily, the reasonableness of an accommodation is an issue for the jury.");
5 see also Swanson, 232 Cal. App. 4th at 971 ("[A]n employer's failure to properly engage in the
6 process is separate from the failure to reasonably accommodate an employee's disability and gives
7 rise to an independent cause of action.").

8 On this record, there is a dispute as to whether IBM provided Plaintiff a reasonable
9 accommodation. Therefore, IBM's motion as to this claim is denied.

### D. Claim #4: Fraud in the Inducement

As his fourth claim, Plaintiff alleges that IBM made certain misrepresentations regarding short-term disability benefits that induced Plaintiff not to pursue such benefits, under the belief that he would lose the benefits when IBM terminated his employment. Compl. at ¶¶ 41-42. IBM moves for summary judgment contending that Plaintiff cannot establish the elements of fraud. Mot. at 14.

The elements giving rise to a claim for fraud are: (1) misrepresentation; (2) knowledge of falsity, or "scienter;" (3) intent to defraud; (4) justifiable reliance; and (5) resulting damage. Davis v. S. Cal. Edison Co., 236 Cal. App. 4th 619, 642 (2015). IBM's motion addresses only the first four elements.

#### i. Misrepresentation

Plaintiff contends that Mr. Matchak, from IBM's human resources, made certain statements about the intersection between short-term disability benefits and termination that constitutes a misrepresentation. Pl. Decl. at ¶ 37. Specifically, Plaintiff refers to an Instant Messenger conversation between him and Mr. Matchak that took place on June 19, 2013—the same date Plaintiff was notified he was being laid off. See Matchak Decl., Ex. M. Plaintiff initiated the conversation by making general inquiries about whether IBM could separate an

United States District Court
Northern District of California

employee who is on short-term disability or is applying for it. In response, Mr. Matchak stated that typically human resources reviews with IBM Medical before delivering the message of termination to the employee. When Plaintiff kept inquiring, Mr. Matchak stated: "if there's a particular case we might have brewing, let me know and I can arrange a call with you, I, and the nurse case manager." Id. Plaintiff continued to make general inquires, and Mr. Matchak stated: "again, feel free to let me know if when you return [to the United States], we need to get a call with the medical folks." Id. After Plaintiff explained to Mr. Matchak that he was inquiring about himself, Mr. Matchak responded: "ok, so if you ended up having the Dr. submit an MTR to go on [short-term disability], then she and her HR partner would probably review with IBM Medical . . . to determine impact on package offer." Id.

In evaluating the Instant Messenger conversation, there is no indication Mr. Matchak made the misrepresentation that an employee on short-term disability could not be affected by the layoff. First, Mr. Matchak's statements were general responses to Plaintiff's general inquiries. There was no misstatement of fact. See L.A. Memorial Coliseum Comm'n v. Insomniac, Inc., 233 Cal. App. 4th 803, 831 (2015) ("To allege fraud based on an affirmative misrepresentation, a plaintiff must allege a misrepresentation—normally an affirmation of fact."). Second, at the time of the conversation, Plaintiff was neither on short-term disability nor in the process of applying, thus Mr. Matchak could not have made a misrepresentation on a past or existing material fact. See Cansino v. Bank of Am., 224 Cal. App. 4th 1462, 1469 (2014) ("[A]ctionable misrepresentations must pertain to past or existing material facts; [s]tatements or predictions regarding future events are deemed to be mere opinions which are not actionable."). Third, on two occasions, Mr. Matchak offered to arrange a phone call between Plaintiff and IBM Medical to obtain more information about his inquiries, which weakens Plaintiff's argument. As such, Plaintiff has not established that Mr. Matchak made a misrepresentation.

### ii. **Knowledge of Falsity**

Even assuming Plaintiff could establish a misrepresentation based on the Instant

Messenger conversation or other conversations, the court considers whether Plaintiff would be able to establish that Mr. Matchak knew his statements were false. Plaintiff offers no argument on that issue. Moreover, in examining the Instant Messenger conversation, there is no indication that Mr. Matchak had knowledge of falsity; on the contrary, he offered to schedule a phone call between Plaintiff and IBM Medical to obtain the necessary information to Plaintiff's inquiry. As such, Plaintiff cannot establish that Mr. Matchak had knowledge of falsity.

### iii. Intent to Defraud

Even assuming Plaintiff could establish knowledge of falsity, the court considers whether Plaintiff would be able to establish an intent to defraud. Plaintiff, again, offers no argument. Based on the Instant Messenger conversation, and as noted above, there is no indication that Mr. Matchak had any intent to defraud Plaintiff.

### iv. Justifiable Reliance

Lastly, assuming that Plaintiff could establish misrepresentation, knowledge of falsity, and intent to defraud, the court considers whether Plaintiff would be able to establish justifiable reliance. The undisputed evidence shows that he cannot.

Plaintiff argues that he relied on IBM's misrepresentations and did not apply for short-term disability because he was led to believe that he would lose his short-term disability benefits when his employment became terminated. Opp'n at 17. This argument, however, is belied by the evidence on the record. First, Plaintiff has stated that he applied for short-term disability, and the paperwork was submitted to IBM on July 2, 2013. See Pl. Decl. at ¶ 38; Pl. Dep. at 92-93. Second, Plaintiff has stated that his short-term disability leave was approved by IBM. See Pl. Decl. at ¶ 43, Ex. O; Pl. Dep. at 91. Third, Plaintiff testified that he requested a change to his short-term disability leave so that he could make a final business trip to India. See Pl. Dep. at 91-92, 96. Consequently, Plaintiff's short-term disability leave was terminated. See id. at 153; Pl. Decl., Ex. O. Given the clear undisputed evidence, there is no indication that Plaintiff was deterred from applying for short-term disability because of Mr. Matchak's statements, or that he

17

Case No.: 5:14-cv-01358-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICIATION.

decided to terminate his short-term disability status because of Mr. Matchak's statements. As such, Plaintiff would not be able to prove this element at trial.

In sum, there is an absence of evidence to support Plaintiff's claim that IBM committed fraud in the inducement. Accordingly, IBM's motion as to this claim is granted.

### E. Claim #5: Wrongful Termination in Violation of Public Policy

As his fifth claim, Plaintiff alleges that IBM violated his statutory rights when it terminated Plaintiff because of his disability. Compl. at ¶ 49. IBM moves for summary judgment contending that this claim fails because Plaintiff cannot establish a public policy exception to the at-will doctrine based on disability discrimination or other FEHA violation. Mot. at 17.

In California, an employer can terminate an at-will employee for any reason "so long as it is not grounded on a prohibited bias." McGrory v. Applied Signal Tech., Inc., 212 Cal. App. 4th 1510, 1524 (2013). An exception to the at-will doctrine is when the employer terminates an employee and the termination violates "fundamental public policy." Sinatra v. Chico Unified Sch. Dist., 119 Cal. App. 4th 701, 705 (2004). "To establish a claim for wrongful discharge in violation of public policy, a plaintiff must plead and prove (1) a termination or other adverse employment action; (2) the termination or other action was a violation of a fundamental public policy, as expressed in a constitutional, statutory, or regulatory provision; and (3) a nexus between the adverse action and the employee's protected status or activity." Rope v. Auto-Chlor Sys. of Wash., Inc., 220 Cal. App. 4th 635, 660 (2013).

In this instance, it is undisputed that Plaintiff was an at-will employee and that he was terminated from his employment with IBM. See Pl. Dep. at 167-68. As to the second element, termination due to disability discrimination is a recognized fundamental public policy. See Rope, 220 Cal. App. 4th at 660 ("FEHA's policy prohibiting disability discrimination in employment is sufficiently substantial and fundamental to support a claim for wrongful termination in violation of public policy."). Here, however, Plaintiff's first claim asserting disability discrimination has been dismissed. See supra § III(A). Since there is no remaining claim that is contingent on Plaintiff's

18

Case No.: 5:14-cv-01358-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICIATION.

termination, this claim fails as a matter of law.  Accordingly, IBM's motion as to this claim is granted.

### F.  Punitive Damages

Pursuant to California Civil Code § 3294(a), "the jury may award punitive damages where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice."  Roby v. McKesson Corp., 47 Cal. 4th 686, 712 (2009).  IBM moves for summary judgment contending that Plaintiff's claims do not warrant punitive damages.  Mot. at 17.  The court agrees.  Given that Plaintiff seeks punitive damages for his fraud claim, which was dismissed above, there are no legal grounds for seeking punitive damages.  See Opp'n at 20; supra at § III(D).  Accordingly, IBM's motion as to this issue is granted.

## IV.  CONCLUSION

For the foregoing reasons, IBM's Motion for Summary Judgment or, in the alternative, Summary Adjudication is GRANTED IN PART AND DENIED IN PART.

The motion is GRANTED as to the following claims: (1) first claim alleging disability discrimination in violation of FEHA; (2) fourth claim alleging fraud in the inducement; (3) fifth claim alleging wrongful termination in violation of public policy; and (4) Plaintiff's prayer for punitive damages.

The motion is DENIED as to the following claims: (1) second claim alleging failure to engage in timely, good faith interactive process; and (2) third claim alleging a failure to provide disability discrimination.

**IT IS SO ORDERED.**

Dated: November 13, 2015

_____
EDWARD J. DAVILA
United States District Judge

19
Case No.: 5:14-cv-01358-EJD
ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, SUMMARY ADJUDICIATION.